# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01313-RM-NYW

JENNIFER HORAL, a Colorado resident,

Plaintiff,

v.

IHR, INC. D/B/A MIKE WARD INFINITI,
    a Colorado corporation,

Defendant.

---

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Jennifer Horal ("Ms. Horal"), through counsel, submits the following response to Defendant, IHR, Inc.'s (IHR") Motion for Summary Judgment ("Motion").

The salient facts in this case are:

- On September 6, 2016, Ms. Horal began working for IHR as a member of the sales staff for the Mike Ward Maserati dealership. (Plt. Resp. to UMF#4; Plt. Resp. to UMF#9; *see also* Plt. Resp. to UMF#1).

- Shortly after she began working for IHR, Ms. Horal executed an employment agreement guaranteeing her a salary of $3,000 per month for her first three months of employment. (Plt. Resp. to UMF#5). Ms. Horal was told by her supervisor, Robert Thumel, and by a Human Resources representative, that she was being offered the guaranteed salary for the first three months because she would be receiving her training during that period and was not expected to sell a lot of vehicles.  (Plt. Resp. to UMF#5; Plt. Resp. to UMF#7). After the three month

period, Ms. Horal was told, her salary would be commission and bonuses only. (Plt. Resp. to UMF#5).

- The first three weeks of Ms. Horal's employment, she received computer training and product training.  She received virtually no one-on-one training on the appointment system known as VIN solutions, and had little understanding of how IHR processed deals. (Plt. Resp. to UMF#5).

- On October 7, 2016, the General Manager of the Mike Ward Infiniti dealership, Peter Kim, conducted a meeting for sales managers and consultants from all of the Mike Ward dealerships. (UMF#12, #13) As part of a team building exercise, the sales force was divided into teams and played "Family Feud." (UMF#13).

- During that game, the following question was posed:  "What does someone need to do (other than work harder) in order to get a promotion at work?" (UMF#13).

- The top answer given by Mr. Kim was either "sleeping with" or "dating" the boss. (Plt. Resp. to UMF#14).

- IHR's Employee Handbook prohibits employees from "dating" or "sleeping with" their "boss." (Plt. Resp. to UMF#14).

- Ms. Horal was offended by the top answer, and complained about it to Mike Ward, the dealer principal of the Mike Ward dealerships, on October 10, 2016; and to Peter Kim on October 17, 2016. (Plt. Resp. to UMF#15; Plt. Resp. to UMF#24).

- After her complaint to Mike Ward, Ms. Horal noticed a few of her male colleagues giving her disapproving looks as they walked by her office.  One of her colleagues even shook his head at Ms. Horal as he peered into her office. (Plt.'s UMF#3).

- On October 21, 2016, all of the sales consultants were required to enter into a new Compensation Plan that significantly altered the terms of employment for most of them. (Plt. Resp. to UMF#25). In particular, the "revised" Plan for the first time imposed a minimum number of vehicles sales for consultants to sell after the three-month training and trial period. (*Id.*) The revised Compensation Plan did not immediately apply to Ms. Horal, as she was still in her training and trial period. (*Id.*; Plt. Resp. to UMF#26).

- After her complaint to Mike Ward, sales managers stopped sending Ms. Horal leads (as they had done previously), which severely limited the available sales opportunities for her. (Plt.'s UMF#4).

- Eleven days later, on November 1, 2016 – twenty-two days after Ms. Horal complained about the "sleeping with/dating the boss" statement, and more than a month before the end of her three month training and trial period – Ms. Horal's employment was terminated, purportedly for poor sales performance. (UMF#40; Plt. Resp. to UMF#41).

## I.     THE SUMMARY JUDGMENT STANDARD FOR A RETALIATION CLAIM.

In *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011), the Tenth Circuit set forth the standard for ruling on a summary judgment motion in the absence of direct evidence of retaliation:

> If the plaintiff cannot directly establish that retaliation played a motivating part in the employment decision, she may instead rely on the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to prove retaliation indirectly. Under the *McDonnell Douglas*/indirect approach, the plaintiff must first make out a prima facie case of retaliation by showing "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (internal quotation marks omitted). If the plaintiff establishes a prima facie case, the

> employer must then offer a legitimate, nonretaliatory reason for its decision. *Id.* at 1211. Finally, once the employer has satisfied this burden of production, the plaintiff must show that the employer's reason is merely a pretext for retaliation. *Id.*

(Citations and parallel citations omitted.) As with all summary judgment motions, when ruling on a summary judgment motion applicable to a retaliation claim, courts must view "the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Mayo v. Fowler Fitness, Inc.*, 111 Fed. Appx. 69, 70 (10th Cir. 2004) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

As shown below, Ms. Horal has set forth facts establishing a prima facie case of retaliation, IHR has advanced a supposedly legitimate, nonretaliatory reason for its actions, and Ms. Horal has shown that the reason given by IHR was "merely a pretext for retaliation." Thus, under the *McDonnell Douglas* test, the Motion should be denied.

## II.   IHR DOES NOT CONTEST THAT THE RELEVANT FACTS ESTABLISH A PRIMA FACIE CASE OF RETALIATION AGAINST MS. HORAL.

In its Motion, IHR concedes that the averments set forth above by Ms. Horal (and sworn to in her affidavit) are sufficient to establish a prima facie case of retaliation. (*See* Mot. at 9.) Despite this concession, IHR misstates the law on temporal proximity, that is, the closeness in time between a protected action and an adverse action. According to IHR, "temporal proximity alone is generally insufficient to justify an inference of causation in most cases." (Mot. at 9 (citing *Conner v. Schnuck Markets, Inc.*, 121 F. 3d 1390, 1395 (10th Cir. 1997).) [1] The Tenth Circuit Court of Appeals has held exactly the opposite. *See, e.g., Trujillo v. Pacificorp.*, 524 F.3d 1149,

---

[1] Additionally, the case cited by IHR does not support its argument. *Conner* states: "We have held that '[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, **such as protected conduct closely followed by adverse action**.' " *Conner*, 121 F.3d at 1395 (citations omitted) (emphasis added).

1158 n.5 (10th Cir. 2008) ("In fact, in the context of retaliation claims, we have permitted plaintiffs to establish a prima facie case of discrimination by showing only close proximity in time between a protected activity and an adverse action.") (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239–40 (10th Cir.2004); *see also E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Because the time between Ms. Horal's complaint and her discharge was only twenty-two days, it cannot seriously be disputed that she has established a prima facie case of retaliation based on temporal proximity.

### III. IHR PURPORTED "LEGITIMATE, NON-DISCRIMINATORY REASON" FOR DISCHARGING MS. HORAL IS PRETEXTUAL.

In the Motion, IHR argues that it has articulated a legitimate, nondiscriminatory reason for the decision to terminate Ms. Horal's employment: "poor performance in selling only 3 vehicles in two months." (Mot. at 6.) Assuming that this proffered reason satisfies IHR's burden, Ms. Horal must present sufficient evidence that, viewed in a light most favorable to her, would permit a jury to find that IHR's reason for its action was a pretext for discrimination. "Pretext may be demonstrated by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Robinson v. Dean Foods Co.*, 654 F. Supp. 2d 1268, 1281-82 (D. Colo. 2009) (quoting *Morales v. McKesson Health Solutions*, LLC, 136 Fed. Appx. 115, 118 (10th Cir. 2005)). "Other '[e]vidence of pretext may include, but is not limited to ... prior treatment of plaintiff; the employer's policy and practice regarding [female] employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria.' " *Leyba v. City of Santa Fe*, 1999 WL 35808922,

at *2 (D.N.M. Sept. 8, 1999) (quoting *Simms v. Okla. ex rel. Dept. of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999), *overruled on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).  "When assessing whether plaintiff has made an appropriate showing of pretext, [a court] must consider the evidence as a whole." *Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

Here, numerous facts show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that would permit a jury to find that the reason given for Ms. Horal's discharge – poor performance – is pretextual.

> **A.      Although Not Dispositive, the Fact that Ms. Horal Was Fired Twenty-Two Days After Her Complaint Is Evidence of Pretext.**

The first evidence that the reason given for Ms. Horal's termination – poor performance – was pretextual is the short time frame (twenty-two days) between Ms. Horal's complaint and her discharge. As this Court stated in *Pathak v. Fedex Trade Networks T and B Inc.*, 329 F. Supp. 3d 1263, 1287 (D. Colo. 2019), although temporal proximity is "not sufficient by itself to establish pretext, the temporal proximity between [an employee's] protected conduct and h[er] retaliation is highly probative of pretext." *See also Hysten v. Burlington Northern Santa Fe Ry. Co.*, 372 F. Supp. 2d 1246, 1257 (D. Kan. 2005) ("The Tenth Circuit has clearly stated in multiple opinions that temporal proximity gives rise to an inference of retaliation but that it is not sufficient— standing alone—to raise a genuine issue of pretext."); *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000) ("Close temporal proximity between the employee's complaint and the adverse employment action is a factor in determining whether the employer's proffered reason is a pretext for retaliation.").

> **B.      The Timing of Ms. Horal's Discharge, and Its Inconsistency With the**

**Structured Training and Trial Period at IHR, Is Also Evidence that the Given Reason for Her Discharge Was Pretextual.**

The temporal proximity between Ms. Horal' complaint and her discharge is not the only "timing issue" that shows the supposed reason for firing Ms. Horal was pretextual. The short time Ms. Horal was employed by IHR, slightly less than two months – particularly when considered within the context of the IHR's three month training and trial program – also shows that the excuse of poor performance given for her discharge was pretextual.  IHR's dealerships, like other dealerships (*see* Plt. Resp. to UMF#5), has a training and trial period for its new sales consultants. During this grace period – three-months at IHR at the time Ms. Horal worked for it – new sales employees such as Ms. Horal were not expected to sell a lot of vehicles, for at least three reasons, First, during that three-month period, Ms. Horal would need to be trained.  She needed training on the computer system and software used by IHR and Maserati, and she required product training on the vehicles she would be selling. (Plt. Resp. to UMF#5; Plt. Resp. to UMF#7). This product training was especially important for new sales employees because Maserati vehicles are not run-of-the-mill automobiles; at the time Ms. Horal was working for IHR, the new vehicle prices started at more than $70,000, with most of the vehicles manufactured by Maserati costing more than $100,000. (Plt. Resp. to UMF#5). Similarly, potential buyers would be different from the buyers at, for instance, AutoNation Jeep West (where Ms. Horal had previously worked). (*Id*.) As a result, Ms. Horal needed to learn (among many other things) about the financing systems used by IHR, and the financial qualifications for potential Maserati buyers. (Plt. Resp. to UMF#5). Further, Ms. Horal required training on the appointment system known as VIN solutions, so she could understand the internal processes and procedures used by IHR to process deals.  Training on, and then actually learning, about the various products and systems was time consuming the first few

weeks, which took away from time to sell vehicles. (Plt. Resp. to UMF#5).

Second, the process for selling automobiles – commonly referred to funneling – is a long-term process. Imagine the process for selling automobiles as a funnel. (Plt. Resp. to UMF#10). At the large end of the funnel are all of the possible buyers of a vehicle. These people include those who come to the store without any advance notice; those who call into the store and make appointments; friends and acquaintances of the sales consultant; potential buyers who have made Internet inquiries; interested buyers who have been referred to a specific sales consultant by a previous buyer; potential buyers developed through marketing to select groups, such as doctors, lawyers, and entrepreneurs; and others. (*Id*.) As these potential buyers move through the funnel, many of them are eliminated; they are not financially able to buy a Maserati, they are not interested in the lifestyle represented by the Maserati, they think a Maserati is too expensive, their spouses object to the expenditure, and so and on. (*Id*.) Ultimately, only a few potential buyers go all the way through the funnel and purchase a vehicle. The ability to sell vehicles, therefore, requires a constant supply of potential buyers to fill up the funnel. And finding these potential buyers takes time, particularly early on. (*Id.*)

Third, IHR's Maserati store presented particular challenges during the time Ms. Horal began working. Because the Maserati dealership was brand new, it did not have an established customer base for the vehicles Ms. Horal was selling. (Plt.'s UMF#7). Additionally, because the Maserati dealership had just opened its doors – as Ms. Horal stated in her deposition, "They were just moving their boxes in when I started" (*id.*), things were in disarray. (*Id.*) For instance, although Ms. Horal had an office, she had no computer when she began, and she had to find another computer even to log into the system. (*Id*.) These and many other challenges impaired news sales

employees' ability to sell vehicles the first few months they worked there.  Accordingly, IHR's training and trial program created a three-month grace period for new sales employees during which they were not judged because they had low sales.  The termination of Ms. Horal for poor performance before she had even worked there for two months is inconsistent with IHR's employment structure for new sales consultants.

How would Ms. Horal have known that she would not be judged on her sales the first three months she worked at IHR?  **First**, she was told that. Ms. Horal began working for IHR on September 6, 2016, the Tuesday after Labor Day. Even before she started working for IHR, Ms. Horal was told, both by her supervisor, Robert Thumel, and by a representative of the Human Resources Department, Laura Sandberg, that the dealership did not expect her to sell, and would not be concerned if she did not sell, many Maserati vehicles during the three-month trial and training period.  (Plt. Resp. to UMF#5). Rather, Ms. Horal should focus, particularly the first month or two, on learning and understanding the process used by the Maserati dealership to sell vehicles.  (*Id.*) This representation by IHR managers is inconsistent with, and contrary to, Ms. Horal's discharge after she worked at IHR for less than two months.

**Second**, IHR's own compensation agreements show that it did not expect new sales consultants to sell a significant number of vehicles the first three months of their employment. Shortly after Ms. Horal was hired in September 2016, she and IHR entered into a Compensation Plan ("First Plan") and a Compensation Plan Addendum ("First Addendum"). The First Addendum established a payment plan, unique to new sales consultants, that "guaranteed a minimum compensation of $3,000 per month" during the first three months. (First Addendum at 1.)  As was explained to Ms. Horal, and as she understood from her past experience selling motor vehicles, the

purpose of the three-month guaranteed compensation package was to pay sales consultants an amount that would allow them to meet some or all of their living expenses during the training and trail period, and specifically to compensate new sales consultants for the fact that they needed time to get up to speed at the Maserati store, and it would take time to begin selling Maserati vehicles. (Plt. Resp. to UMF#5; Plt. Resp. to UMF#7).  And although IHR altered its First Plan on or about October 21, 2016, it did not alter in any way the First Addendum's guarantee to new sales consultants of a minimum compensation of $3,000 a month for the first three months of employment.  (Plt. Resp. to UMF#25).

**Third**, when IHR put in place a new Compensation Plan on or about October 21, 2016, it imposed minimum tri-monthly sales quotas for its sales consultants of "18 units combined for the most recent 3 month period, on an ongoing basis" (Second Plan at 1).[2] The imposition of these quotas, however, did not apply to sales consultants during the training and trial period; IHR expressly exempted sales by new sales consultants during the first three month of employment. (*See id.* at 1 (minimum sales requirement began "[a]fter 3 months of employment"); *see also id.* "[E]xample: If you are hired on February 1, you will be held to the [minimum sales] requirement beginning with the May-July three month period." Thus, although IHR created a new compensation plan that required a minimum number of sales (over a rolling three month period), it also recognized that during the first three months they worked, new sales consultants could not

---

[2] IHR's Second Plan states that "[f]ailure to meet the minimum volume requirement will result in termination unless an exception is granted by the General Manager due to extenuating circumstances," (Second Plan at 1.) Despite this, Ms. Horal has identified at least seven employees who did not meet the minimum number of sales over a three month period but were not discharged. Indeed, five of the seven are still employed by IHR, and the other two resigned voluntarily months after their failures to meet the requisite minimum number of sales. (*See* Plt. Resp. to UMF#25; Plt. Resp. to UMF#26.)

be expected to meet the Compensation Plan's minimum sales requirement. Thus, IHR's own Compensation Plans demonstrate that IHR's policy was not to discharge a sales consultant based on his or her sales performance the first three months of employment.  IHR's discharge of Ms. Horal, supposedly for poor performance in the vehicle she sold between September 6, 2016 and October 31, 2016, therefore, is inconsistent with, and contrary to, its own policy.

> ### C.     The Fact that Other Employees With Similar Sales Numbers Were Not Fired Is Inconsistent with IHR's Supposed Reason for Discharging Ms. Horal.

In its Motion, IHR asserts as "established fact that all other Sales Consultants over the last almost six years who performed as poorly as Plaintiff did in September and October of 2016, were either terminated or resigned . . . ." (Mot. at 12.) This is easily disproven by looking at one of the male sales consultants – Tyler Kalil – who began working at IHR around the same time as. Ms. Horal began. Ms. Horal worked from September 6, 2016 through October 31, 2016.  Ms. Horal sold one vehicle in September 2016, and two vehicles in October 2016, for a total of three vehicles during that one and three-quarters months. (Mot. at 1; Plt. Resp. to UMF#27; Plt. Resp. to UMF#28).  Mr. Kalil began work on August 8, 2016, and he sold two vehicles in August 2016 and two vehicles in September 2016, for a total of four sales. (Plt. Resp. to UMF#27). Thus, he sold one vehicle more than Ms. Horal during an essentially identical two month period of time.[3]  Yet he was not fired; in fact, he work for IHR until December 15, 2017, more than a year after his training and trial period, when he voluntarily resigned.

Moreover, IHR can only maintain its pretense that Ms. Horal's sales were worse than other sales consultants only by misstating Ms. Horal's starting date. As can be seen from sales

---

[3] Nor did he show a marked improvement his third month; he sold two vehicles in October 2016. (*See* Plt. Resp. to UMF#27).

information provided by IHR, it IHR calculates sales made by beginning sales consultants by dividing the periods of time into (a) mo. of hire; (b) 1st mo.; (c) 2nd mo.; and (d) 3rd mo. (*See e.g.,* Plt. Resp. to UMF#27) (showing names of employees, hire and termination dates, and sales).) It then states that Ms. Horal's hire date was 08/29/2016; and that Ms. Horal sold zero vehicles in her month of hire, sold one vehicle in her first month, and two vehicles in her second month. (*Id.*) But the date Ms. Horal actually started working for IHR was September 6, 2016. (Plt. Resp. to UMF#4; Plt. Resp. to UMF#9). She could not have started working earlier because she had plans, made months earlier, to go with friends to Telluride Film Festival, which ran from Friday, September 2, 2016, to Monday, September 5, 2016. (Plt. Resp. to UMF#4*; see* https://www.telluridefilmfestival.org/news (stating that "Telluride Film Festival takes place Friday, September 2 - Monday, September 5, 2016.").  Ms. Horal specifically recalls telling managers at the Maserati dealership that she could not start work until September 6, 2016. (Plt. Resp. to UMF#4; Plt. Resp. to UMF#9). She went to the Film Festival, and started working the day after Labor Day weekend.[4] (*Id.*) Thus, the calculation of Ms. Horal's sales should be that she sold one vehicles in her month of hire (September 2016), sold two vehicle in her first full month (October 2016), and then was fired before she could sell vehicles in her second full month.  And if her sales are calculated with her correct start date, then several sales consultants with sales that were similar to, or even less than, Ms. Horal's sales during the month of hire and the first full month were allowed to continue working. (*See, e.g.*, Plt. Resp. to UMF#27 (numbers during month of hire and first full month for Banegas, Ricardo A. (3.0); Gianopoulos, Brandon G. (2.0); Glenn,

---

[4] Ms. Horal recalls going to the dealership and filling out paperwork the week before Labor Day, but she did not actually begin work until September 6, 2016, the Tuesday after Labor Day.  (Plt. Resp. to UMF#4).

David A. (0.0); Haak, Richard J. (3.5); Hildestad, Loren C. (3.0); Kalil, Tyler A. (4.0); Miller, Barbra Rose (1.0); Seymour, Michael S. (1.0); Shankland, Robert J. (1.5); Von Bank, Thomas D.(3.0).) None of these sales consultants was fired after their month of hire and first full month of sales, as Ms. Horal was, even though most of them had the same or fewer sales than Ms. Horal did.  Thus, the excuse given for Ms. Horal's discharge – poor performance – is inconsistent with the fact that IHR did not fire other sales consultants with similar, identical, or worse, sales during the same period of time:  the month of hire and the first full month.

IHR may try to argue that, with respect to the sales consultants identified in the preceding paragraph, they may have had low sales their month of hire and first full month of work, but many of them had excellent sales their second full month of work.  (*See, e.g.* Plt. Resp. to UMF#27, Banegas, Ricardo A. (10.5 sales second full month); Gianopoulos, Brandon G. (10 sales second full month).) But this proves the point that new sales consultants should not be, and absent some illegitimate reason are not, judged based on their sales the first month or two, as they will not typically sell a substantial number of motor vehicles immediately.  As Ms. Horal has attested to in her Affidavit:

> "Not every potential buyer purchases a car at the first meeting.  In fact, with luxury and performance vehicles like Maseratis, most buyers did not purchase the car immediately. When I was fired, I had approximately a dozen potential purchasers with whom I was still fully engaged, providing information for, and setting up "be back appointments" for November 2016.  To gauge my performance after I had been working for less than two months is preposterous.

(Plt. Resp. to UMF#10).  In sum, had Ms. Horal been given the chance to work a second and third full month, as other sales consultants were, and as was IHR's standard practice, she would have had the opportunity to sell a substantial number of vehicles for IHR. The fact that she was not given that chance can only be attributed to retaliation for objecting to sexual harassment.

     **D.**     **IHR's Attempt to Compare Ms. Horal with Juliann Leach Illustrates the Weaknesses and Implausibilities with IHR Supposed Reason for Firing Ms. Horal.**

In its Motion, IHR attempts to show that its discharge of Ms. Horal was not in retaliation for her complaint about the Family Feud game but was about sales by purporting to compare Ms. Horal's treatment with the treatment of Juliana Leach, the other female IHR employee who was present at the Family Feud game and who complained about the sleeping with/dating the boss comment.  IHR argues that because Ms. Horal and Ms. Leach both complained about the game, and Ms. Horal was fired but Ms. Leach was not, Ms. Horal's complaint could not have been the reason for her discharge. The reason for the different treatment, therefore – IHR continues – must have been the difference in sales by the two women.

IHR's attempt to compare the two women fails completely both with respect to their complaints and with respect to their sales. First, the complaints made to IHR by the two women differed significantly. Following the Family Feud game, Ms. Leach complained to her manager, Pat Corbitt who was, in her words, "kind of my -- my protector, I will say, in the organization . . . . [H]e kind of sponsor[ed] me as a friend there . . . ."  (Plt. Resp. to UMF#22); *see also id.* ("I felt like [the male sales associates] were kind of watching there for me to fail. But, like I said, Pat Corbitt was so supportive. . . . And he was always looking for my back for some reason."). Ms. Leach described her discussion with Mr. Corbitt as follows:

> He asked me if I wanted to address [her complaint] with somebody else.  And I felt that Pat kind of calmed me down, and said, "[L]isten, Juliana, this is just a game.· It's nothing into it between lines.· Don't worry.· It was just a game."  And I -- I'm not a person to create problems, you know. So I just, in my mind, said, okay, just let it go, you know, move on, continue.

(Plt. Resp. to UMF#22) ("This [Family Feud game] ma[d]e me feel very uncomfortable, very

uncomfortable.· I never understood the purpose.· But Pat Corbitt calmed me down.· He said it's

okay.· Don't worry.· He asked me, you want to proceed doing this. And I'm like, you know, forget

it. I'm not going – I'm not going to waste more time doing this, because I need to sell cars.")

Although Mr. Corbitt communicated Ms. Leach's complaint by email to Mike Ward on October

11, 2016, Mr. Corbitt made it clear that the matter was closed. He wrote:

> Juliana stated she was satisfied with Pat['']s explanation and felt relieved th[at] there
> was no messages being sent. When asked if she need to talk with anyone else about
> the issue, she stated no she was fine and wanted to go to work, thank you for
> listening and reassuring me that nothing was intended with the answers to the sales
> meeting question. It just made her feel very uncomfortable.

(Plt. Resp. to UMF#22).

The path taken by Ms. Horal was very different. Ms. Horal knew that Ms. Leach had

complained to Pat Corbitt on October 8, 2016, the day after as the Family Feud game. (Plt. Resp.

to UMF#22). Ms. Horal, however, spoke to no one in management the day of the game, or over

the weekend.  On the following Monday, October 10, 2016, Ms. Horal approached Mike Ward

(the Dealer Principal and General Manager of the Mike Ward Infiniti, Alfa Romeo, Fiat, and

Maserati dealerships), and asked if she could speak with him.  She then told him about the last

question and top answer in the Family Feud game, and how uncomfortable it had made her and

Juliana Leach in the sales meeting. Ms. Horal said that Ms. Leach had complained to her sales

manager, Pat Corbitt, about the incident. Mike Ward was "actually surprised" when Ms. Horal

mentioned Ms. Leach's complaint because as of October 10, 2016, Mike Ward "didn't even know

that Juliana [Leach] raised a concern with Pat Corbitt." (Plt.'s UMF#6).  In response, Mike Ward

wrote an apology to Ms. Horal, and stating that he had talked with Peter Kim (the general manager

of the Infiniti dealership, who had put on the Family Feud game), who also apologized. Mike Ward

also said that "[w]hen Peter gets back from vacation he will be happy to sit down with you and listen to your concerns." (*See* UMF#16; Plt. Resp. to UMF#17).  Ms. Horal responded, stating: I realize much of what I am saying was already discussed in our meeting but I feel it is important to speak my truth in writing for Peter to see as well. I will look forward to meeting with Peter. In hindsight, I do in fact have some questions I would like to ask him." (Plt. Resp. to UMF#17).

On October 17, 2016, Ms. Horal met with Mr. Kim, Mr. Ward (who came late to the meeting), and Laura Sandberg (a Human Resources representative). During that meeting, before Mr. Ward arrived, Ms. Horal and Mr. Kim discussed the Family Feud incident, and then whether a woman had "ever had any woman hold a sales manager or finance manager position before?" While that question was being discussed, Mr. Ward arrived, and the tenor changed immediately. Rather than discussing the Family Feud incident, Mr. Ward aggressively attacked Ms. Horal on several matters, including her temerity to discuss the Family Feud matter with other employees, her conversations with other sales consultants about her personal life, her sales record, and other supposed failings. (*See* Plt. Resp. to UMF#24).

These Notes show that after Ms. Horal's complaint to Mr. Ward, he made extensive efforts to gather information, not for the purpose of eliminating sexual harassment in the workplace or for addressing Ms. Horal's concerns, but for the purpose of developing excuses to fire Ms. Horal. Indeed, the Notes can be construed as a focused effort by Mr. Ward to dig up dirt on Ms. Horal. Accordingly, the Notes reveal that Ms. Horal's and Ms. Leach's circumstances were quite different:  simply put, Ms. Horal made waves and Ms. Leach did not.

IHR's attempt to compare the vehicle sales of Ms. Leach and Ms. Horal is also fatally flawed for the simple reason that they sold very different kinds of vehicles.  Ms. Horal sold

Maseratis and Ms. Leach sold Infinitis. As Ms. Leach explained:

> Selling Maseratis is very different than selling a regular car, because it's a car that
> is over $100,000.· Of course, the clients, they need to know more about the cars,
> specifics, and things like that. And – and the way that the Maserati dealership runs
> is very different to the way that the Infiniti runs, because in the Maserati [dealership
> are] rich people·coming inside, drinking coffee, looking at the cars. It's not like in
> Infiniti that a client – a customer comes, and it's a bunch of salespersons waiting to
> see who is going to catch who. So she was telling me that she didn't receive that
> many sales calls.· She was all the time complaining to me that, because they have
> this calling that you need to kind of distribute fairly the calls. And she mention to
> me that she barely receive any calls.

(Plt. Resp. to UMF#29).  Moreover, Ms. Leach found a niche for herself at the Infiniti dealership

by selling **used** Infinitis (and other used vehicles), not new Maseratis. As Ms. Leach testified, the

two are very different:

> Q.      How long after you started with the dealership did you actually start selling
> cars?
> A.      I don't recall, but, actually, I was – I did pretty good for my experience. I –
> I think that I performed really good.
> I didn't perform really good with new cars, with the ones that are new, because – I
> don't know – when the customers arrive to the dealership, and you have a lot of
> solid men sales representatives there, it's kind of like trying to fight, you know, for
> the -- for the customer in a very subtle way, but I think that I – I performed good.
> I mean, every time I approach a client – I – I felt that I performed good.· I – I –
> yeah. But, like I said, selling used cars, people already kind of know what they
> want, and basically you just take them to the test drive, but they already investigate
> on that car, that's why they are there. So it's much easier selling a car that way then
> when you have to convince a person to choose an Infiniti over a Mercedes, or over
> a BMW, or -- or even a Maserati over a Lamborghini, because then you really need
> – you need to know exactly what you're talking about.·

(Plt. Resp. to UMF#29).

To summarize, IHR's attempt to compare Ms. Horal's vehicle sales, and her treatment after

complaining about the Family Feud game, with the sales and treatment of Juliana Leach, is fatally

flawed. The situations surrounding their respective complaints, and the circumstances involving

their respective sales, are too different to allow a legitimate comparison.

### E.   Ms. Horal's Low Sales Were Due in Part to the Fact that the Maserati Dealership Sabotaged Her Sales Efforts.

IHR's supposed reason for firing Ms. Horal – poor sales performance – is also pretextual because IHR was itself at least partially responsible for Ms. Horal's low sales. After Ms. Horal complained about the Family Feud game on October 10, 2016, sales managers stopped sending Ms. Horal sales leads, as they had previously been doing. (Plt.'s UMF#4; *see also* Plt. Resp. to UMF#29.)[5]  Without these sales leads, it was very difficult for Ms. Horal to generate new sales leads. Additionally, after her complaint to Mr. Ward, her telephone suddenly stopped working and it took almost a full week before it was repaired or turned back on.  (*See e.g.*, Plt. Resp. to UMF#44). Again, her ability to sell Maserati vehicles was greatly impaired by the lack of available selling tools.  (*Id.;* Plt.'s UMF#4).  Finally, other sales consultants began ostracizing her. After her complaint to Mike Ward, some of Ms. Horal's her male colleagues gave her disapproving looks as they walked by her office, and one of her colleagues shook his head at Ms. Horal as he peered into her office.  (Plt.'s UMF#3).  These actions or inactions collectively impaired Ms. Horal's ability be a member of the sales team, and to sell Maserati vehicles successfully.

### F.   IHR's Subjective Criticisms of Ms. Horal Fail to Provide a Legitimate Reason for Her Termination.

---

[5] In his Declaration, Ms. Horal's immediate supervisor, Robert Thumel, states that he "reviewed a printout of Ms. Horal's performance for her two months of employment with Mike Ward Maserati, which showed that she had received 33 leads, including 15 walk-ins, 10 telephone leads, and 8 internet leads, yet only sold 3 vehicles." Declaration of Robert Thumel ¶ 6 (Ex. G to Mot.)  Ms. Horal contests these numbers as inflated; in particular the number of Internet leads is wrong because Ms. Horal never worked Internet leads. (Plt. Resp. to UMF#30). But even if these numbers were accurate, they ignore the fact that Ms. Horal " had approximately a dozen potential purchasers with whom [she] was still fully engaged, providing information for, and setting up be back appointments for November 2016. (*Id.*) Further, without knowing when these leads were given to Ms. Horal – before or after her complaint to Mike Ward – and how many leads were given to the other sales consultants, these numbers fail to rebut Ms. Horal's sworn statement that "sales managers stopped sending Ms. Horal sales leads after she complained to Mike Ward.

The evidence set forth above, viewed in a light most favorable to Ms. Horal, demonstrates a material issue of fact about whether IHR's discharge of Ms. Horal was pretextual. In a desperate attempt to obscure that fact, IHR attempts to smear Ms. Horal by resorting to the old subjective chestnut that Ms. Horal's was a bad worker. IHR asserts that based on his "observations," Mr. Thumel "did not believe" Ms. Horal "was making any effort to sell vehicles or that she was even engaged in the process." (Mot. at 6.) Mr. Thumel criticizes Ms. Horal for being "frequently on her cell phone (*Id.*), and also concocts a story in which he supposedly "observed her decline a new customer offered by another Sales Consultant, indicating that she didn't need to sell anything because she was "on a guarantee." (*Id.*)

"Courts view with skepticism subjective evaluation methods" such as the ones here. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) (and cases cited therein); *Martin v. AT&T Corp.*, 331 F.Supp.2d 1274, 1297 (D. Colo. 2004). Indeed, the use of subjective evidence may itself be evidence of pretext. *See, e.g., Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001) ("Against the background of the other evidence of pretext, the subjective nature of these criteria provides further circumstantial evidence that SRP denied Bergene the promotion as a form of retaliation . . . .") This skepticism of subjective evaluations is warranted because there is no objective way to evaluate the assertions, and thus a jury could rationally reject them.  In fact, Mr. Thumel's assertions are a classic example of improper subjective evaluations; Ms. Horal has no way to prove them false other than to deny emphatically the allegations.  Ms. Horal unequivocally denies that she did not "make any effort (or only made a minimal effort), to sell vehicles; or that she was not engaged in the process.  (Plt. Resp. to UMF#34).  She also denies that she was on her cell phone an excessive amount, although

she was forced to use her cell when her office phone stopped working. And she emphatically denies as false Mr. Thumel's story that Ms. Horal turned down helping a new customer because she was on a guarantee.  Plainly put, that is a vicious lie. (*Id.*)

## CONCLUSION

For the reasons set forth above, Jennifer Horal requests the Court to deny IHR's motion for summary judgment.

Respectfully submitted this 23rd day of May, 2019.

ANDERSON BARKLEY, LLC

*A duly signed copy is on file at the
 offices of Anderson Barkley, LLC*

s/ Jeanine M. Anderson
**Jeanine M. Anderson**
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1766
Jeanine@AndersonBarkleyLaw.com

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of May, 2019, a true and correct copy of the foregoing was served via CM/ECF on:

William A. Rogers, III
Dietze & Davis, P.C.
2060 Broadway, Suite 400
Boulder, CO 80302
(303) 447-1375
wrogers@dietzedavis.com

s/Jeanine M. Anderson