**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 18-cv-01313-RM-NYW

JENNIFER HORAL, a Colorado resident,

      Plaintiff,

v.

IHR, Inc., d/b/a MIKE WARD MASERATI, a Colorado Corporation,

      Defendant.

_____

## ORDER
_____

Plaintiff Jennifer Horal ("Ms. Horal") was terminated from her employment from Defendant IHR, Inc. d/b/a Mike Ward Maserati ("IHR"), an automotive dealership, after she complained of sexual harassment. Ms. Horal filed charges of sexual harassment and retaliation with the Equal Employment Opportunity Commission ("EEOC") on July 7, 2017, less than 300 calendar days after the alleged retaliation. The EEOC issued Ms. Horal a Notice of Right to Sue letter on March 29, 2018. This lawsuit followed. The case is now before the Court on IHR's Motion for Summary Judgment ("Motion") (ECF No. 47) seeking judgment as a matter of law in its favor on the sole count brought in Ms. Horal's Complaint. (ECF No. 1.) Ms. Horal filed a response in opposition; IHR filed a reply. The matter is ripe for resolution.

## I.    BACKGROUND

### A.  IHR's Corporate Structure

Mike Ward, an individual, owns several dealerships located side-by-side in between I-

470 and Lucent Boulevard in Highlands Ranch, Colorado through Defendant IHR,[1] which

employs all individuals who work at Mike Ward Infiniti and Mike Ward Maserati dealerships.[2]

(ECF No. 47-2, ¶¶1, 2.) Mike Ward is also, among other roles, the General Manager overseeing

the Mike Ward Maserati dealership and all dealerships operating under IHR and MAFHR, LLC,

and was during the relevant time period. (*Id.*, ¶4.) IHR's employees could sell vehicles at any of

the IHR dealerships and had separate licenses associated with each of the dealerships' unique

dealer numbers. (*See* ECF No. 52-16.)

### B. Ms. Horal's Hiring and Employment

Ms. Horal applied for the position of Sales Consultant at Mike Ward Maserati on August

11, 2016. (ECF No. 47-3.) At the time of filing her application, Ms. Horal had successfully sold

vehicles at AutoNation Jeep West for five years. (ECF Nos. 47-4, 48:6–11, 50:8–21, 51:7–53,

106:1–5; 52-1, ¶8.) Robert Thumel, a Sales Manager at Mike Ward Maserati at the time,[3] was

responsible for interviewing and hiring Mr. Horal and based his decision to hired Ms. Horal, at

least in part, on her prior experience and stated success in selling vehicles. (ECF Nos. 47-8, ¶2;

47-18.) The parties dispute the date on which Ms. Horal was hired, and consequently which

month should be considered her month of hire, which the Court will address below, but there is

no dispute that Ms. Horal was hired with a $3,000 per month guaranteed base pay. (ECF Nos.

47-5; 47-18; 64-14.)

It is also undisputed that between August 29, 2016 and August 31, 2016, Ms. Horal

logged 8.67 hours at Mike Ward Maserati. (ECF Nos. 47-5; 52-10, 154:14–155:14; 64-1.) Ms.

---

[1] IHR, Inc. does business as Mike Ward Infiniti, and MAFHR, LLC does business as Mike Ward Maserati of Denver and Mike Ward Alfa Romeo and Fiat South Denver. (ECF No. 47-2, ¶1.)

[2] Mike Ward Maserati collectively refers to Mike Ward Maserati and Mike Ward Alfa Romeo and Fiat South Denver. (ECF No. 47-2, ¶2.)

[3] Mr. Thumel is now the General Sales Manager for the Mike Ward Maserati, Alfa Romeo, and Fiat dealership. (ECF No. 47-8, ¶1.)

Horal was paid a net total of $252.82 for her time – her pro rata share of the $3,000 guaranteed base pay premised on three days of work out of thirty-one. (ECF No. 64-1.) Ms. Horal did not work between Friday, September 2, 2016 and September 5, 2016 (over Labor Day weekend), because she was attending the Telluride Film Festival. (ECF Nos. 52, at 12; 52-10, 154:14–155:14.)

On September 7, 2016, the Colorado Department of Revenue issued Ms. Horal three Temporary Salesperson Licenses for the following dealerships:

- Mike Ward Infiniti – Associated Dealer # 42911;

- Mike Ward Alfa Romeo and Fiat of South Denver – Associated Dealer # 43263; and

- Mike Ward Maserati of Denver – Associated Dealer # 43264.

(ECF No. 52-16.) These licenses gave Ms. Horal the ability to sell vehicles at any of the dealerships.

On September 22 and 23, 2016, Ms. Horal officially signed a Compensation Plan and a Compensation Plan Addendum, the latter providing the provision regarding Ms. Horal's guaranteed income of $3,000 per month for the first three months of her employment if she remained employed. (ECF Nos. 47-6; 47-7.) During her employment, Ms. Horal reported to Mr. Thumel and Mark Todd. (ECF Nos. 47-2, ¶3; 47-4, 103:2–17, 105:1–15.) Ms. Horal was one of six or seven Sales Consultants at Mike Ward Maserati. (*Id.*)

## C. October 7, 2016 Sales Team Meeting

On Friday mornings, the entire sales staff of the IHR dealerships, including Sales Managers and Consultants, were required to attend sales meetings. (ECF No. 52-3, 41:16–42:11.) On October 7, 2016, Peter Kim, General Manager of Mike Ward Infiniti, organized a

Family Feud-style contest where the sales staff was asked to guess the most popular answers to a variety of prompts. (ECF No. 47-2, ¶5.) The final prompt read as follows: "Name a reason that your boss would give you a raise (other than working hard)." (ECF Nos. 47-2, ¶6; 47-9.) The number one answer was either "dating your boss" or "sleeping with your boss."[4] (ECF Nos. 1, ¶13; 47-2, ¶7; 47-2, ¶6; 47-4, 125:16–127:7; 47-9; 52-3, 51:14–52:21.) This response made Ms. Horal and Juliana Leach, the only two females on the sales team, uncomfortable. (ECF Nos. 47-2, ¶7 47-10; 47-12, 69:5–11; 47-14; 47.)

### D. Ms. Horal and Ms. Leach's Complaints

On October 8, 2016, Ms. Leach approached her supervisor, Pat Corbitt, to express her discomfort over the final answer in the presentation and that she was concerned that some message was being communicated. (ECF No. 47-12, 12:2–10.) Mr. Corbitt assured Ms. Leach there was nothing to read between the lines, and it was just a game. (*Id.*) He also asked whether Ms. Leach wanted to speak to anyone else about her concerns, but she declined. (ECF Nos. 47-12, 12:2–10; 52-3, 55:23–56:9, 57:20–22.) Mr. Corbitt's reassurances relaxed Ms. Leach and she was able to let it go and move on. (ECF No. 52-3, 55:23–56:9, 57:20–22.) Mr. Corbitt relayed the gist of his conversation with Ms. Leach to Mr. Ward via email on October 12, 2016. (ECF No. 47-14.)

On Monday October 10, 2016, Ms. Horal spoke with Mike Ward and expressed her discomfort over the final answer to Mr. Kim's presentation. (ECF No. 47-2, ¶6.) Specifically, Ms. Horal was concerned that Mr. Kim had made up the questions himself, and he had some sort of intent. (ECF No. 47-10.) Mr. Ward told Ms. Horal he believed Mr. Kim had simply pulled the

---

[4] The parties dispute whether the operative term was "sleeping with" or "dating"; however, it's undisputed that this is a distinction without a difference, and both actions are prohibited by IHR's Company Dating Policy and the Employee Handbook. (ECF Nos. 52-4; 52-5.)

questions from the internet, and Mr. Kim meant nothing by it. (*Id.*) Nonetheless, Mr. Ward apologized and suggested that Ms. Horal speak with Mr. Kim when he returned from his vacation. (*Id.*)

Later that day, Mr. Ward followed-up with Ms. Horal via email, apologizing and informing Ms. Horal that he had spoken with Mr. Kim on the phone and confirmed that Mr. Kim had not created the questions for the sales team meeting, but he had pulled them from the internet at random. (ECF No. 47-11.) Mr. Kim, through Mr. Ward, expressed his apologies if he had made anyone uncomfortable and stated that it was not his intent. (*Id.*) Ms. Horal, Mr. Ward, and Mr. Kim agreed to meet the following week. (*Id.*)

### E. Ms. Horal's Sales Performance Compared to Ms. Leach's

By the end of September 2016, Ms. Horal had sold only one vehicle – a used 2014 BMW 48XI for $37,263.99 in cash. (ECF No. 64-5.) Considering her sales performance in September, Mr. Thumel and Ms. Horal had several discussions on how to improve Ms. Horal's sales and how to comply with IHR's sales protocols (e.g., making sure every customer was introduced to a Manager before leaving the dealership). (ECF Nos. 47-8, ¶4; 64, ¶10.) Neither party identifies when these discussions took place relative to the October 7, 2016 sales meeting, but Ms. Horal admits she and Mr. Thumel spoke on more than one occasion about how to improve her sales and compliance with established protocols. (*See* ECF No. 64, ¶10.)

By the end of October 2016, Ms. Horal had sold two more vehicles – a 2017 Maserati Ghibli S Q4 for $107,408.34 and a used 2016 Dodge Journey SXT for $18,355.09 – which brought her total sales up to three vehicles between August 2016 and October 2016. (ECF No. 68-1.) According to Ms. Horal's Employee CRM Activity, Ms. Horal had somewhere between thirty-three and twenty-five leads on potential buyers. (ECF No. 47-17.) Ms. Horal's sales

figures were below Mr. Thumel's expectations. (ECF Nos. 47-8, ¶5; 47-4, 115:6–23.)

By comparison, Ms. Leach, who was hired on September 8, 2016 without any prior automotive sales experience, sold one car in September, ten in October, and five in November, for a total of sixteen vehicles sold through three months:

Table 1: *Horal's Sales Compared to Leach's (Full Month)*

| Employee Name | Units Sold | | | | |
|---|---|---|---|---|---|
| | August | September | October | November | Total |
| Jennifer Horal | 0 | 1 | 2 | N/A | 3 |
| Juliana Leach | N/A | 1 | 10 | 5 | 16 |

(ECF No. 47-12, 68:18–22.) It is historically IHR's policy to review Sales Consultants' performances in the first few months of their employment, and do not retain Sales Consultants beyond three months after selling only three vehicles within that time. (*See* ECF No. 47-20, ¶¶3–6.)

### F. October 17, 2016 Meeting

Meanwhile, on October 17, 2016, a meeting was held between Ms. Horal, Mr. Kim, Laura Sandberg,[5] and Mr. Ward. (ECF No. 47-15.) During the meeting, Mr. Kim apologized directly to Ms. Horal. (*Id.*) Mr. Kim asked Ms. Horal if she had any questions for him, but she told him she did not. (*Id.*)

When Mr. Ward arrived, he was brought up to speed on the discussions up to that point and stated he had heard from other employees with whom Ms. Horal had discussed her feelings about the October 7, 2016 meeting, including Ms. Leach. (*Id.*) Ms. Horal confirmed she had discussed the incident with several coworkers, and Mr. Ward explained he didn't believe it was the best approach to be "gossiping about the event." (*Id.*) Mr. Ward stated he was aware of Ms.

---

[5] Ms. Sandberg is the Controller and Human Resource representative for IHR and was during the relevant time period. (ECF No. 47-20.)

Leach's discomfort and stated that the correct approach would be to "discuss any concerns with her supervisor and if necessary, Mike [Ward], Peter [Kim] or Laura [Sandberg], but not with other employees." (*Id.*)

After discussing some issues regarding personal gossip in the workplace, Mr. Ward commented on Ms. Horal's sales – one car since August 29, 2016. (ECF No. 47-15.) Mr. Ward also mentioned that he had heard Ms. Horal allowed a customer to "walk" (i.e., leave the dealership) on the Saturday before speaking with a manager. (*Id.*) According to the meeting notes, Ms. Horal "acknowledged it and said that that was why she was recommending a new 'early stage customer form' for handling new customers to get important information from them." (*Id.*) Mr. Ward reminded Ms. Horal to be respectful of the manager processes that were already in effect for dealing with customers and that those processes needed to be followed. (*Id.*) Ms. Horal admitted she should have been more persistent in the given instance and should have gotten a manager. (*Id.*)

### G. Ms. Horal's New Compensation Plan and Termination

IHR instituted a new Compensation Plan for all Sales Consultants, which Ms. Horal signed on October 21, 2016. (ECF No. 47-2, ¶12.) The new plan was largely identical to the previous Compensation plan Ms. Horal signed in September, apart from the addition of a sales volume minimum measured over the course of three months after the conclusion of the first three months of employment. (ECF No. 47-16, at 1.) It is undisputed that failure to meet the sales volume minimum was the not the basis for Ms. Horal's termination as it did not apply to her. (ECF No. 47-16, at 1; 64-3, ¶14.)

Toward the end of October 2016, though the record does not make clear exactly when, Mr. Thumel reviewed Ms. Horal's CRM Activity printout, which measured referrals, sales numbers, appointments, vehicles that were shown, and how many "BeBacks" for a Sales

Consultant. (ECF No. 47-17.) Ms. Horal's CRM Activity numbers, namely, the number of vehicles sold were well below Mr. Thumel's expectations. (ECF No. 47-8, ¶5.)

It is unclear when Mr. Thumel made the final decision to terminate Ms. Horal, but after advising Mr. Ward, Mr. Thumel and Ms. Sandberg prepared the Termination Report, dated November 1, 2016. (ECF No. ECF No. 47-8, ¶¶16–18, 20, 22–23.) The Termination Report provided the following reasons for Ms. Horal's termination: "Jennifer['s] sale[s] performance was unsatisfactory. She often let customers leave [without] a [turn over] to a manager." (ECF No. 47-18.) Mr. Thumel, Ms. Sandberg, and Ms. Horal met in the morning of November 1, 2016 and Ms. Horal was terminated. (ECF Nos. 47-8, ¶21; 47-19.)

Ms. Horal's action followed, raising one claim for relief based on her termination allegedly in retaliation for having complained of sexual harassment premised on the final answer to the Family Feud-style contest during the October 7, 2016 sales meeting. IHR contends it is entitled to summary judgment in its favor on this claim.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569–70 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the

burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted); *Stone*, 210 F.3d at 1136 (only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment). The Court considers the facts in the light most favorable to Plaintiff, as the non-movant, "unless contradicted by the record." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 961 (10th Cir. 2017) (citing *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015)).

## III. ANALYSIS

Ms. Horal alleges IHR terminated[6] her in retaliation twenty-two days after she complained on October 10, 2016 about the number one answer to the final question in the Family Feud-style contest. Ms. Horal brings this lawsuit under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.).

To survive summary judgment on a claim of retaliation plaintiff must present either direct evidence of retaliation or indirect evidence that satisfies the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (citing *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). The parties agree there is no direct evidence of retaliatory animus, therefore, the Court must apply the *McDonnell*

---

[6] Ms. Horal alleges other adverse actions in her Complaint, such as requiring Ms. Horal to execute a new Compensation Plan within several months of employment, which contained a minimum volume sales requirement. However, the parties agree this new rolling minimum performance requirement did not apply to Ms. Horal. Thus, the Court finds the only adverse action at issue is Ms. Horal's discharge on November 1, 2016.

*Douglas* burden-shifting.

Under the indirect evidence three-step framework, a plaintiff must first establish a prima facie case. If the plaintiff does so, the burden of production (not persuasion) then shifts to the defendant employer "to offer a legitimate nondiscriminatory reason for its employment decision." *Wilkie*, 915 F.3d at 1267 (quotation marks and citation omitted); *Fassbender*, 890 F.3d at 884 (burden of production). This is an "exceedingly light burden." *Wilkie*, 915 F.3d at 1268 (citing *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007)) (internal citations marks omitted).

"If the employer [meets its burden], the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Wilkie*, 915 F.3d at 1268 (quotation marks and citation omitted). To meet this third stage burden, a plaintiff must show pretext: that the employer's proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Wilkie*, 915 F.3d at 1268 (citing *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006)) (internal citation marks omitted). A plaintiff's "[m]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Wilkie*, 915 F.3d at 1268 (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)) (internal quotation marks omitted). In determining whether a plaintiff's burden has been met, the court "consider[s] the evidence of pretext in its totality," *Fassbender*, 890 F.3d at 884, and as they appeared to the decision-maker, *Bennett*, 792 F.3d at 1268.

## A. IHR Concedes Ms. Horal Can Demonstrate a Prima Facie Case

For the purposes of this Motion, IHR concedes (1) Ms. Horal engaged in protected

opposition to discrimination in relation to the Family Feud-style sales meeting presentation, (2) her termination constituted an adverse employment action for the purposes of her retaliation claim, and (3) that there is a causal connection between the protected activity and the adverse employment action based, at least in part, on the temporal proximity between complaint and termination. (ECF No. 47, at 9 (citing *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982)).)

### B. IHR Articulated a Legitimate, Nondiscriminatory Justification for Terminating Ms. Horal

To sustain its burden under the *McDonnell Douglas* framework, IHR must show a legitimate non-discriminatory rationale for its adverse employment action. *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005) (citing *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). IHR asserts its legitimate reason for Ms. Horal's termination was she failed to sell more than three vehicles between September 2016 and November 2016, which when compared to her less-experienced colleagues was not up to her supervisor's expectations in light of her five years of experience. (ECF Nos. 47, at 10; 65, at 4–10.) *See also Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009) (citing *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (stating poor job performance is a legitimate, nonretaliatory reason for termination)). Ms. Horal assumes, for the purpose of this Motion, that IHR has satisfied its burden of production and has articulated a legitimate, nondiscriminatory reason for terminating Ms. Horal – poor sales performance.

### C. Ms. Horal Failed to Raise a Genuine Issues of Material Fact Regarding Whether IHR's Proffered Non-Discriminatory Reason is "Unworthy of Belief"

The Court next considers whether Ms. Horal has raised a genuine issue of material fact regarding whether IHR's proffered reasons for terminating Ms. Horal are "unworthy of belief."

*See Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017). The Court finds no rational factfinder could find IHR's reason for terminating Ms. Horal isn't worthy of credence because Ms. Horal was treated consistently when compared to similarly situated colleagues and consistent with IHR's historic practices regarding Sales Consultants.

"A plaintiff may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1200 (10th Cir. 2015) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)) (internal quotation marks omitted). Mere conjecture, however, is insufficient to show pretext as a matter of law. *Zisumbo*, 801 F.3d at 1200. The focus of a Title VII pretext analysis is on the decision-maker's motivation. *Zisumbo*, 801 F.3d at 1200 (citing *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1144 (10th Cir. 2009)).

Ms. Horal argues IHR's underperformance rationale is pretext for three main reasons. First, the temporal proximity between her complaint on October 10, 2016 and her termination on November 1, 2016 (twenty-two days) is evidence of pretext. Second, Ms. Horal argues she was treated inconsistently, with respect to sales volume expectations, during her three-month training period when compared to other colleagues. Third, Ms. Horal argues IHR sabotaged her efforts to sell vehicles, which accounted for her low sales.

    1.  <u>Temporal Proximity of Ms. Horal's Complaint to Her Termination</u>

Unlike evaluating Ms. Horal's prima facie case, temporal proximity alone is insufficient to establish, or raise a genuine issue of material fact concerning, pretext, but it "may support a

funding of pretext [. . .] in combination with other evidence of pretext." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 976 (10th Cir. 2017) (citing *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013)). The remaining evidence will be considered in combination with the following analysis given Ms. Horal's initial complaint was on October 10, 2016 and she was ultimately terminated twenty-two days later.

### 2. IHR Did Not Treat Ms. Horal Inconsistently During the First Three Months of Employment

Ms. Horal argues IHR's expectations during her training period were inconsistent with IHR's expectations regarding other Sales Consultants because Sales Consultants are required to undergo product and systems training that impedes their ability to sell vehicles during the first few months of employment. Ms. Horal's argument, however, is not supported by the evidence.

To address IHR's argument that Ms. Horal's sales performance was below par as compared to her other colleagues, the Court must first resolve when to start the clock – the Court must define Ms. Horal's month of hire, first full month, and second full month.

Ms. Horal applied for employment with IHR on August 11, 2016. Ms. Horal's timecard reflects she worked for 8.67 hours over three days in August (29–31). She was paid her pro-rated share of $3,000 – $252.82 net. Despite being paid for her time in August, Ms. Horal could not have sold cars because she had not yet received her Temporary Salesperson Licenses until September 7, 2016. (*See* ECF No. 52-16.)

The dispute regarding which month should constitute Ms. Horal's first full month of employment arises from Mr. Horal conflating "employment" with ability to "sell vehicles." More precisely, Ms. Horal did not sell vehicles prior to September 7, 2016 because she did not yet have her sales licenses. (*See* ECF No. 52-16.) She also argues she could not have started working because she attended the Telluride Film Festival between September 2 and September 5, 2016.

Much of Ms. Horal argument is premised on the incorrect assumption that the comparisons between her and other Sales Consultants should therefore be based on whether Sales Consultants with similar numbers after their first full month of employment were similarly treated. This comparison is inaccurate as it is apparent that one does not get paid for time worked if they are not yet employed.

Whether Ms. Horal decided to take time off early in her employment, however, is of no consequence with respect to her official date of hire and it did not affect her sales expectations. For example, had Ms. Horal taken a week off in the middle of October 2016, would that month not still count as a full month? Seemingly, a full month of employment for Employee A is not comparable to Employee B's full month if Employee B goes on vacation and makes a conscious decision to forego the opportunity to be at work those days. It follows, according to Ms. Horal's argument, that had she taken even a single day off during any month, she would be able to avoid all comparison between her numbers and other Sales Consultants' numbers because she would not have worked a single full month. No rational juror could find that Ms. Horal would be on IHR's payroll in August 2016 and somehow not employed by IHR until September 2016. The Court has concluded because Ms. Horal was paid for her time spent at the dealership in August 2016 the undisputed material facts demonstrate Ms. Horal Ms. Horal's month of employment was August 2016, her first full month was September 2016, and her second full month was October 2016.

That said, Ms. Horal sold three vehicles between her month of hire and the end of her second full month, despite receiving at least twenty-five leads.[7] Comparatively, three Sales

---

[7] Ms. Horal disputes whether she received thirty-three, in part, because she did not handle internet leads. (ECF No. 52-1, ¶26.) Internet leads accounted for eight out of the alleged thirty-three. (ECF No. 47-17.) Ms. Horal does not dispute the accuracy of the remaining figures. Therefore, construing the facts in a light most favorable to Ms.

Consultants, (1) hired around the same time or after Ms. Horal and (2) with no prior automotive sales experience, outperformed Ms. Horal within the same period of time. This includes Ms. Leach on whom Ms. Horal had a head start:

*Table 2: Sales Comparison (August 2016 – October 2016)*

| Employee Name | Units Sold | | | |
|---|---|---|---|---|
| | August 2016 | September 2016 | October 2016 | Total |
| Jennifer Horal* | 0 | 1 | 2 | 3 |
| Tyler Kalil | 2 | 2 | 2 | 6 |
| Matthew Rice | 2.5 | 3.5 | 4 | 10 |
| Juliana Leach | N/A | 1 | 10 | 11 |

(ECF Nos. 47-8, ¶¶8–9; 47-12, 68:18–22.) Importantly, both Mr. Kalil and Mr. Rice worked with Ms. Horal at Mike Ward Maserati. (ECF No. 47-8, ¶7.)

Additionally, Ms. Leach – who complained to her supervisor for the same reasons as Ms. Horal – was hired on September 8, 2016. Even if the Court were to find Ms. Horal began "working" on September 7, 2016, Ms. Leach was hired after Ms. Horal and sold about four times as many vehicles as Ms. Horal within the same period. Not shown in Table 2 is the fact that at the end of Ms. Leach's second full month of employment, Ms. Leach sold sixteen cars – more than five times as many as Ms. Horal within a comparable period. *See supra* Table 1.

Ms. Horal attempts to distinguish her sales from Ms. Leach's because Ms. Leach: (1) was at the Infiniti dealership as opposed to the Maserati dealership; and (2) had more sales experience. Neither of these arguments sufficiently differentiate the two Sales Consultants.[8]

First, Ms. Horal argues her sales numbers are distinguishable because Ms. Leach worked at Mike Ward Infiniti whereas Ms. Horal worked at Mike Ward Maserati and selling Maseratis is

---

Horal, the Court will consider the Motion in light of the uncontested number of leads compared to the number of actualized sales - twenty-five leads, setting five appointments (20%), showing four (16%), and selling three (12%).

[8] Ms. Horal also argues the difference between her and Ms. Leach is that Ms. Horal "made waves" and Ms. Leach did not. However, this does not serve to distinguish the volume of sales from either Sales Consultant.

more difficult than selling Infinitis. This argument, while technically correct, has no distinguishing effect here, because Ms. Horal, like Ms. Leach, was able to sell vehicles at any Mike Ward-affiliated dealership. For example, Ms. Horal did not sell three Maseratis – she sold one new Maserati, a used BMW, and a used Dodge. By comparison, Ms. Leach also sold one Maserati, *and* an additional ten vehicles. Therefore, Ms. Horal's argument that her sales numbers would logically be lower than Ms. Leach's simply due to the product being sold is unpersuasive.

Ms. Horal further argues Ms. Leach's sales numbers are not subject to comparison, because Ms. Leach has more sales experience. Specifically, although Ms. Leach was hired without any automotive sales experience, she received a Bachelor of Arts in International Business from Florida Metropolitan University and had seven years selling advertising space on billboards in soccer stadiums for InterForever Sports, CCN. (ECF Nos. 47-12, 12: 2–10; 47-13; 52-3, 8:10–9:16, 12:2–17, 30:5–12; 64-4, 73:11–75:4.) While there are no doubt certain qualities that may translate between markets, selling vehicles requires different, in this case new, product knowledge. Ms. Horal essentially argues two contradictory points: (1) Ms. Leach's prior sales experience assisted her in transitioning to automotive sales; but (2) Ms. Horal's prior automotive sales experience could not have helped her to sell more vehicles. This line of argument is also unpersuasive. Therefore, the Court finds Ms. Horal and Ms. Leach's sales volumes are comparable.

If the above comparison were not enough, IHR provided extensive uncontested historic Sales Consultant information regarding thirteen Sales Consultants – from 2014 through 2018 – to substantiate its argument that Sales Consultants with the same or similar performance as Ms. Horal had either been terminated or voluntarily left. (ECF No. 65-2, 65-3.) According to these undisputed figures, five out of thirteen Sales Consultants sold one vehicle or less in their first full

month of employment, and out of those five, only two sold less than three vehicles their second full month:

- Ms. Horal - 2.0, who was terminated after her second full month; and

- Mr. Hudgins - 0.0, who was terminated prior to his second full month.

(ECF No. 65-2, ¶12.) Additionally, there were two other Sales Consultants whose time with IHR was also cut short:

*Table 3: Hildestad and Vitale*

| Employee Name | Date of Hire | Term Date | Units Sold | | | |
|---|---|---|---|---|---|---|
| | | | Month of Hire | 1st Full Month | 2nd Full Month | Total |
| Loren C. Hildestad | 10/11/2016 | 12/8/2016 | 0 | 3 | 0 | 3 |
| Christopher M. Vitale | 5/20/2015 | 6/30/2015 | 0 | 1.5 | N/A | 1.5 |

Mr. Hildestad voluntarily terminated his employment less than two months after he was hired. (ECF No. 65-2, ¶7.) And Mr. Vitale was terminated on June 30, 2015. (ECF No. 65-2, ¶13.)

Most importantly, there were five Sales Consultants in the last four years who sold three total vehicles or less after their second full month of employment:

*Table 4: Sales Volume Less Than Three Units after Two Full Months*

| Employee Name | Date of Hire | Term Date | Units Sold | | | |
|---|---|---|---|---|---|---|
| | | | Month of Hire | 1st Full Month | 2nd Full Month | Total |
| David Glenn | 1/28/2015 | 4/6/2015 | 0 | 0 | 3 | 3 |
| Christopher M. Vitale | 5/20/2015 | 6/30/2015 | 0 | 1.5 | N/A | 1.5 |
| Jennifer Horal* | 8/29/2016 | 11/1/2016 | 0 | 1 | 2 | 3 |
| Loren C. Hildestad | 10/11/2016 | 12/8/2016 | 0 | 3 | 0 | 3 |
| Samuel Hudgins | 6/1/2018 | 7/17/2018 | 0.5 | 0 | N/A | 0.5 |

Mr. Glenn voluntarily terminated his employment just over two months after he was hired, Mr. Vitale was terminated after his first full month, Ms. Horal was terminated just over two months after she was hired, Mr. Hildestad voluntarily terminated his employment less than two month after he was hired, and Mr. Hudgins was terminated before his second full month. (*See* ECF No. 65-3.)

In addition to these objective measures, Mr. Thumel stated he did not believe Ms. Horal "was making any effort to sell vehicles or that she was engaged in the process." (ECF No. 47-8, ¶12.) Ms. Horal argues the Court should not incorporate Mr. Thumel's subjective criticisms into IHR's reason for her termination. However, the cases on which Ms. Horal relies are examples of situations in which ranking systems were *wholly* subjective. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) (defendant admitted the ranking and evaluation system was wholly subjective); *Martin v. AT&T Corp.*, 331 F. Supp. 2d 1274, 1297 (D. Colo. 2004) (comments regarding plaintiff's work in each category did not differ in substance from previous year, but numerical rating was far worse). This case, however, involves a mix of both objective and subjective evaluation. *See Sasser v. Salt Lake City Corp.*, 772 Fed. Appx. 651, 669 (10th Cir. 2019) (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007)) ("existence of subjective criteria alone is not considered evidence of pretext," because *some* subjectivity is to be expected in certain situations); *see also Conroy v. Vilsack*, 707 F.3d 1163, 1177 (10th Cir. 2013). Therefore, the Court does not view Mr. Thumel subjective criticisms with the suspicion Ms. Horal argues is warranted. Even if the Court were to disregard Mr. Thumel's subjective criticisms, it is still left with the objective sales figures through Ms. Horal's second full month of employment.

Ms. Horal also argues she was inconsistently treated because IHR provided her a guaranteed minimum salary through her first three months of employment, which indicated IHR was aware Sales Consultants would not be expected to sell many vehicles within that period. Ms. Horal, however, mischaracterizes the three-month period in which she was guaranteed a minimum salary of $3,000 as a "grace period." The documents, however, clearly do not provide guaranteed *employment* – it provides a guaranteed minimum salary "while employed and

performing up to standards." (ECF No. 47-7.) Based on IHR's historic data, discussed in detail above, it is clear Sales Consultants with IHR dealerships sold cars within the first few months of employment despite simultaneous training. (ECF Nos. 47-8, ¶¶7–9; 64-2, ¶¶3–13; 64-3.) While it is reasonable to conclude that IHR anticipates a lower volume of sales in the early months of employment, "lower volume" does not mean little or de minimis. *See supra* Tables 2–4 and accompanying text. No rational factfinder could conclude that IHR would absolve Ms. Horal of all expectations to sell vehicles during her early months of employment.

The remainder of Ms. Horal's arguments regarding inconsistent treatment simply ignore the fact that other Sales Consultants in similar situations sold more vehicles. Ms. Horal argues she was training and couldn't sell many vehicles. This argument, however, ignores the fact that other comparable Sales Consultants who brought even less automotive sales experience went through training as well and still managed to sell more vehicles. *See supra* Table 2. Specifically, both Mr. Kalil and Mr. Rice sold double and triple the number of vehicles, respectively, despite being hired around relatively the same time at the same dealership. Notably, neither had any previous automotive sales experience. Ms. Horal argues Mr. Kalil sold only one more vehicle than Ms. Horal in a two-month period (August 2016 through September 2016), but she neglects to mention Mr. Kalil sold six vehicles at the end of his second full month of employment – double the amount Ms. Horal ended up selling. (ECF No. 64-3.) Ms. Horal fails to explain how she was incapable of both training and selling vehicles where other Sales Consultants were able to show substantial improvement even in their second full month of employment. (*See* ECF No. 65-3.) Consequently, she cannot logically argue her situation was markedly different from either Mr. Kalil's or Mr. Rice's, she simply did not meet the objective standards required within the first three months of employment with IHR, and she was terminated accordingly.

Furthermore, Ms. Horal argues she faced unique difficulties, such as, the Maserati dealership itself posed unique difficulties because it was a new building,[9] Maserati's being harder to sell, and funneling[10] takes time. According to Ms. Horal, the Mike Ward Maserati dealership was brand new, which created unique challenges. (ECF No. 52-1, ¶13.) Mike Ward began selling Maseratis in June 2015 and moved out of a temporary showroom into a permanent building in August 2016. (ECF No. 64-2, ¶25.) Additionally, Mr. Kalil and Mr. Rice were faced with the same difficulties and managed to sell more vehicles. In short, all three Sales Consultants faced the same difficulties, but Ms. Horal simply failed to sell more than three vehicles compared to her colleagues.

Given the above figures, and comparing Ms. Horal's sales figures with other Sales Consultants, the Court finds no rational factfinder could conclude Ms. Horal was treated inconsistently with IHR's policies when compared to other Sales Consultants.

### 3. Alleged Sabotage Is Not a Material Dispute

Finally, Ms. Horal attributes her admittedly low sales volume to the fact that she was sabotaged when: (1) she stopped receiving referrals from managers after October 10, 2016; (2) her work phone line stopped working and remained inoperative for a week; and (3) her colleagues looked at her disapprovingly.

There remains a dispute whether Ms. Horal's managers stopped providing her referrals

---

[9] In Ms. Horal's Opposing Party's Additional Undisputed Material Facts ("AUMF"), paragraph 7 states as follows: "IHR's Maserati store presented particular challenges during the time Ms. Horal began working. Because the Maserati dealership was brand new, *it did not have an established customer base for the vehicles Ms. Horal was selling*." (Emphasis added.) Ms. Horal then cites to ECF No. 52-1, ¶13. Paragraph 13 of Ms. Horal's affidavit states: "It also didn't help that at the time I began working at IHR, the Maserati dealership was brand new and had just opened its doors. They were still moving boxes and everything was in disarray. I did not even have my own computer at first, so I had to find another computer to even log in to clock in." Notably, this paragraph of Ms. Horal's affidavit lacks any mention of Mike Ward Maserati's customer base. To the extent a dispute could been inferred from the position taken in paragraph 7 of the AUMF regarding Mike Ward Maserati's lack of customer base due to its move into a permanent facility, it is manufactured and a mischaracterization of the statements in Ms. Horal's affidavit.

[10] An amorphous piece of jargon associated with the process of separating all potential buyers from the final buyers.

after she complained to Mike Ward on October 10, 2016. However, viewing the facts in the light most favorable to Ms. Horal, IHR does not dispute that Ms. Horal may have had potential buyers in her funnel for November 2016, although it does not contend to have knowledge related to Ms. Horal's funnel. Ms. Horal attested, however, that she was successful in obtaining her own leads for November 2016. (ECF No. 52-35, ¶35.) Unfortunately, these two circumstances appear inapposite. On one hand, Ms. Horal argues she was sabotaged and didn't receive referrals after a certain period, which impeded her ability to sell vehicles. On the other hand, Ms. Horal was able, assuming she didn't receive manager referrals after October 10, 2016, to put customers in her funnel for future sales. (ECF No. 52-1, ¶¶9–10.) Therefore, by Ms. Horal's own admission, she did not necessarily rely on manager referrals as she argues. Therefore, under these specific facts, this dispute is immaterial because Ms. Horal could have, and admittedly did, track down her own customers indicating that she could have does so regardless of whether her managers provided her referrals.

Furthermore, Ms. Horal insinuates IHR had something to do with her inoperative phone line. However, she provides no plausible connection between any action taken by IHR and the phone line going, and staying dead, for a week. Additionally, this does not make logical sense given the dealership at-large, including the Sales Managers for each dealership, benefits from as many sales as possible, and it does not follow that it would handicap itself simply to injure the sales of a single Sales Consultant without the ability to recoup the inevitable lost sales. Simply put, Ms. Horal offers no evidence that IHR played a part in her inoperative phone line and merely offers conjecture and speculation as to its cause.

Finally, Ms. Horal provides no evidence to show there was any connection between a singular look of disapproval from an unnamed colleague and Mr. Thumel's decision to ultimate

terminate Ms. Horal for failing to sell vehicles. Simply put, Mr. Horal offers no evidence that would allow a reasonable juror to conclude (1) that the disapproving look had any connection to her October 10, 2016 complaint, and (2) that the reaction of a single colleague suggests IHR's pretext in her termination when it is not clear one way or the other whether this colleague had any input regarding Ms. Horal's termination.

Consequently, Ms. Horal has failed to demonstrate a genuine issue of material fact concerning whether IHR's proffered reason for her termination was pretextual. On this record, no rational factfinder could conclude that IHR's proffered reason is "unworthy of belief." *See Hiatt*, 858 F.3d at 1316.

### D. IHR's Policies

It is readily apparent that Ms. Horal disagrees with IHR's policies. Specifically, when addressing why her sales volume was low at the end of October, Ms. Horal argues that "this proves the point that new sales consultants should not be, and absent some illegitimate reason are not, judged based on their sales the first month or two, as they will not typically sell a substantial number of motor vehicles immediately." (ECF No. 52, at 13.) Ms. Horal further argues that IHR should allow for the consideration of a third full month of employment before making the determination to part ways with a Sales Consultant. In support of her position, Ms. Horal states she had about a dozen potential buyers in her funnel,[11] which would have matured into sales in November had she been able to continue working.

However, the Court does not find this to be a material dispute, because IHR's concern is with units actually sold within the first three months of employment. It is IHR's prerogative to

---

[11] Ms. Horal routinely states she had about a dozen potential purchasers in her funnel for November 2016; however, potential sales and actualized sales are not the same. The fact is that between August 29, 2016 and November 1, 2016, Ms. Horal had only sold three vehicles from at least twenty-five leads.

judge its Sales Consultants accordingly, and the Court will not second-guess IHR's legitimate business judgment. *See Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003) (citing *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Srvs.*, 165 F.3d 1321, 1329 (10th Cir. 1981), *abrogated in part on other grounds as recognized in Eisenhower v. Weber Cty.*, 744 F.3d 1220, 1227 (10th Cir. 2014) (the court should not act "as a super personnel department that second guesses employers' business judgments.")).

## IV.  CONCLUSION

Based on the foregoing, it is ORDERED

(1)    That Defendant IHR, Inc. d/b/a Mike Ward Maserati's Motion for Summary Judgement (ECF No. 47) is GRANTED;

(2)    That Defendant is awarded costs and shall within 14 days of the date of this Order file a bill of costs, in accordance with the procedures under Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1, which shall be taxed by the Clerk of the Court; and

(3)    That the Clerk shall enter JUDGMENT in favor of Defendant and against Plaintiff and close this case.

DATED this 6th day of February, 2020.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge